# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

DR. STEVEN RHODES,

        Plaintiff,

                                        Case No. 3:18-cv-673-MMH-JBT

v.

DETECTIVE PAUL ROBBINS,
in his individual capacity,

        Defendant.

_____/

# **O R D E R**

**THIS CAUSE** is before the Court on Defendant's Motion for Summary Judgment (Doc. 33; Motion), filed on October 29, 2019. In the Motion, Defendant Paul Robbins argues that Plaintiff Steven Rhodes' claim for malicious prosecution under 42 U.S.C. § 1983 is barred by qualified immunity and asks the Court to enter judgment in his favor. Rhodes filed a response in opposition to the Motion on December 6, 2019. See Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 43; Response). Both parties have submitted supplemental authority, which the Court has reviewed. See Defendant's Notice of Supplemental Authority (Doc. 41); Plaintiff's Notice of Supplemental Authority (Doc. 46); Plaintiff's Second Notice of Supplemental

Authority (Doc. 47); Plaintiff's Third Notice of Supplemental Authority (Doc. 48).  Thus, the Motion is ripe for review.

## I.      Background

### A.      The Investigation

Rhodes is a chiropractic physician licensed by the state of Florida. Robbins is a former detective with the Florida Department of Financial Services, Division of Insurance Fraud, who investigated Rhodes and his practice for alleged fraudulent insurance billing.  See Declaration of Detective Paul Robbins (Doc. 34-1; Robbins Dec.) at ¶¶ 2, 8-9.  The investigation began on February 4, 2014, when a former patient, "O.V., made a complaint in reference to fraudulent billing at Ocean View Health, Inc (OVHI) by Rhodes." See Department of Financial Services Division of Insurance Fraud Investigative Summary Report (Doc. 34-3; Summary Report) at Robbins/Rhodes 000011.  Among other things, O.V. reported that her "insurance company was billed for ultrasound, massage and traction at every visit," but "[s]he did not have all of this treatment at every visit."  Id.  Two weeks later, David Kunz of Kemper Direct Insurance Company filed a complaint against Rhodes.  Id.  "Kunz reported that his insured driver, A.N., was seeking treatment with Rhodes at OVHI due to injuries sustained in an automobile accident.  Kunz reported that OVHI [was] billing for manual therapy under CPT 97140 but the Subjective, Objective, Assessment, and Plan

2

(SOAP) notes reveal treatment by a massage therapist with an expired massage license." Id.  After conducting an investigation, Robbins and his colleague, Detective Murphy, concluded that Rhodes improperly billed for therapy performed by two employees—Cynthia Perez and Lisa Jackmore—who were not properly licensed. Id. at 000012.  The detectives also concluded that Rhodes billed for treatments, such as manual therapy, electrical stimulation, and traction, that were never performed. Id.

The three-month long investigation "encompassed sixteen interviews, twenty-one witnesses, and a review of billing records for seven patients." See Robbins Dec. ¶ 9.  Among others, the detectives interviewed OVHI employee Melissa Ross on multiple occasions in February 2014. See Supplement to Summary Report (Doc. 34-4; Supplement) at 000093.  Ross is a licensed massage therapist and a registered chiropractic assistant; she performs manual therapy and massages; she treats approximately 17 patients per day at OVHI. Id.  Ross told the detectives that Rhodes knew that Perez's license was delinquent and that Jackmore did not hold a medical or professional license. Id. at 000094-95.  Ross also stated that before August 2013, she recorded her treatments as lasting fifteen minutes, but "after August 2013 she was told to put thirty (30) minutes as the amount of time for treatment." Id. at 000096.  Ross informed the detectives that Rhodes treats "around thirty (30) patients per day.  The treatment is usually ten (10) to fifteen (15) minutes on

the table for adjustment and ten (10) to fifteen (15) minutes for electrical stimulation." Id. In October 2013, Rhodes told Ross "to make sure her notes on amount of therapy units [were] the same as his." Id. at 000102. Ross "started putting the same number of units [of] therapy to match [Rhodes' notes] until February 5, 2014 when [the detectives] came to the office to interview Rhodes." Id. Since then, Ross "has put the correct number of units on her notes." Id.

The detectives interviewed former OVHI employee Tammy Wilson on February 4, 2014, and February 10, 2014. See Supplement at 000104-05, 000109-12. Wilson told Robbins that she worked for Rhodes "from October 20, 2013 until she was terminated on January 26, 2014." Id. at 000109. According to Wilson, "Rhodes fired her for 'being in the way' and not being a 'team player.'" Id. During her second interview, Wilson reported that after the detectives visited OVHI, "Rhodes was 'going crazy.'" Id. at 000104. She told the detectives that "Rhodes then said, in regards to the fraudulent billing, these are minor things and he actually bent the law and did not break it." Id. at 000105. Wilson said that she "observed Rhodes 're-doing' files [] in order to blame the third party biller." Id.

Jessica Moseley worked for Rhodes from December 2011 to October 2013. See Summary Report at 34. She worked in the front office and performed therapy on patients. Id. According to the Summary Report, Moseley told

detectives that Rhodes instructed employees to bill for two units of therapy when only one unit was performed and that patient H.C. may have been billed for massages he did not receive.  <u>Id.</u> at 35.

In addition to employees, the detectives interviewed the owners of two billing companies used by OVHI.  One of them, Eliot Tucker, told the detectives that "the only thing suspicious was the amount of procedures marked on a fee slip that would indicate the patient would have to be in the office longer." Summary Report at 000032.  Another billing consultant, Evelyn Rivera, told the detectives that Rhodes told her that he did not know that Perez's license was expired.  <u>See</u> <u>id.</u> at 000048.  Rivera told Rhodes that any bills submitted under Perez would need to be reimbursed to the insurance companies and it was his responsibility to verify Perez's license.  <u>Id.</u>  Rivera told the detectives that one unit of treatment is eight to fifteen minutes and two units of treatment is hands-on treatment for thirty minutes, not including dressing or undressing. <u>Id.</u>

Ultimately, the detectives determined that the evidence supported charging Rhodes with one count of schemes to defraud and seven counts of false and fraudulent billing regarding patients O.V., B.L., D.B., R.G., M.S./H.S.,[1]

---

[1] The Affidavit for Arrest Warrant combines M.S. and H.S. in a single false and fraudulent insurance charge.

H.C., and A.N.  Four false and fraudulent billing charges and five patients—

R.G., M.S./H.S., H.C., and A.N.—are at issue in the instant Motion.

**B.    Affidavit for Arrest Warrant/Disposition of Criminal Charges**

On April 4, 2014, Robbins prepared and submitted an Affidavit for Arrest

Warrant (Doc. 34-2) to a county court judge.   In the Affidavit for Arrest

Warrant, Robbins avers, in relevant part:

> On February 2, 2014, O.V. filed a complaint in reference to possible fraudulent billing by Chiropractic Physician Steven Rhodes.  Rhodes is the owner of Ocean View Health, Inc[.]  The complaint dates are from September 2013 to January 2014.
>
> . . .
>
> On February 18, 2014, another complaint was filed by [David Kunz of] Kemper Direct Insurance Company . . . .
>
> The investigation revealed that Rhodes allowed Lisa J and Cynthia P to provide treatment/therapies to patients knowing that [Cynthia] P had an expired LMT license and that [Lisa] J was not licensed.  [Cynthia] P and [Lisa] J provided treatment, which required being a Licensed Massage Therapist or a Registered Chiropractic Assistant.   By doing so, bills were submitted to numerous insurance companies for services that should not have been performed.
>
> The investigation revealed Rhodes was submitting his notes for billing which indicated more units of treatment than what was actually provided.  Rhodes also directed Melissa R to show more units of manual therapy treatment on her notes so it matched what Rhodes put

in his notes.   [Melissa] R would put two (2) units of therapy although she only provided one (1) unit.

By doing this Rhodes caused bills to be submitted to the insurance companies for services that were not rendered.

. . .

During the investigation seven (7) patients were interviewed.   All of the patients had unauthorized billing submitted to their insurance companies for treatment/therapies they never received.

. . .

[As to R.G., there] was ███ in unauthorized bills submitted to State Farm for Traction Therapy and Manual Therapy.  R.G. said she never started receiving traction therapy until February 2014.

[As to M.S. and H.S., there] was ███ in authorized bills submitted to Esurance for Manual Therapy.

. . .

[As to H.C.,] a total of ███ in unauthorized treatment was billed to State Farm Insurance for Manual Therapy and Massage Therapy.

[As to A.N.,] a total of ███ in unauthorized treatment was billed to Kemper Insurance for Manual therapy.[2]

The county court judge issued the arrest warrant, and Rhodes was subsequently arrested for seven counts of making false and fraudulent insurance claims in violation of section 817.234(1)(a)1, Florida Statutes, and

---

[2] The amounts are redacted in the Affidavit for Arrest Warrant.

one count of schemes to defraud in violation of section 817.034(4)(a)3, Florida Statutes. <u>See</u> Arrest Warrant (Doc. 34-2) at 5. Notably, the assigned prosecuting attorney referred Rhodes' case to the Felony Pre-Trial Intervention Program (Intervention Program). <u>See</u> State Attorney's Office file regarding Rhodes (Doc. 34-10; SAO Records) at 000885. On March 26, 2015, the State Attorney's Office <u>nol prossed</u> the charges against Rhodes after he successfully completed the Program. <u>Id.</u> at 000899. As part of the resolution of the charges, Rhodes paid $6,765.43 of investigative costs to the State of Florida; $1,755.21 in restitution to Nationwide Insurance regarding the fraudulent billing associated with the care of O.V.; and $102.40 in restitution to Optum Insurance regarding the fraudulent billing associated with the care of D.B. <u>Id.</u> at 000883-896. He also completed 20 hours of community service. <u>Id.</u>

**C.   This Case**

In the operative Third Amended Complaint and Demand for Jury Trial (Doc. 22; Complaint), Rhodes alleges that Robbins "knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in his application for the warrant for [Rhodes'] arrest, and such statements or omissions were necessary to the finding of probable cause to issue said warrant." <u>Id.</u> at ¶ 34. Rhodes also alleges that Robbins "conducted his investigation with a total disregard and misunderstanding of

the law." Id. ¶ 18.  Regarding the false statements, Rhodes asserts that four of the seven patients interviewed regarding his alleged practice of overbilling "have flatly denied what [Robbins] alleges he was told by them during their interviews.  Therefore, [Robbins'] inclusion of any alleged fraud by [Rhodes] relating to these patients was knowingly false."  Id. ¶¶ 13-14.  As to the omissions and mistakes of law, Rhodes asserts that because Florida law permits a chiropractic physician to bill for "manual physical therapy when it is performed by medical assistants incidental to the practice of the physician," id. ¶ 22, Robbins was wrong to claim that Rhodes violated the law by billing for manual therapy performed by an unlicensed massage therapist.  Id. ¶ 23.  In addition, Rhodes alleges that Robbins and the therapist employee, operated under the incorrect belief that Rhodes' billing practices were unlawful, where in fact his billing practices were fully compliant with insurance practices.  Id. at ¶ 27.

On August 20, 2018, Robbins filed a motion to dismiss the Complaint on the basis of qualified immunity, see Defendant Paul Robbins' Motion to Dismiss Plaintiff's Third Amended Complaint (Doc. 23; Motion to Dismiss), which the Court granted in part and denied in part in a written order entered on March 13, 2019, see Order (Doc. 29).  Specifically, the Court dismissed Rhodes' claims based on his arrest for the scheme to defraud charge and the

false and fraudulent insurance charges related to patients O.V., B.L., and D.B.
See id. at 32.  The Court denied the Motion to Dismiss as it related to Rhodes'
allegations that Robbins included falsities in the Affidavit for Arrest Warrant
relating to patients R.G., M.S./H.S., H.C., and A.N.  See id. at 34.  In short, the
Court concluded that:

> Robbins had arguable probable cause to arrest Rhodes
> for a scheme to defraud, and arguable probable cause for
> [the] three charges of false and fraudulent insurance
> claims [relating to patients O.V., B.L. and D.B.] As such,
> and if Robbins had only arrested Rhodes for these four
> charges, Robbins would be entitled to qualified
> immunity in the entirety from Rhodes'[s] malicious
> prosecution action against him.  However, Rhodes
> [Complaint] plausibly alleges that based on the falsities
> Robbins allegedly included in the Affidavit for Arrest
> Warrant, Robbins lacked arguable probable cause to
> arrest Rhodes for the remaining four charges of false
> and fraudulent insurance claims [regarding patients
> R.G., M.S./H.S., H.C. and A.N.]  While Robbins may
> have had arguable probable cause to arrest Rhodes for
> some of the charges detailed in the Affidavit for Arrest
> Warrant, "probable cause as to one charge will not bar a
> malicious prosecution claim based on a second, distinct
> charge as to which probable cause was lacking." [Elmore
> v. Fulton Co. Sch. Dist., 605 F. App'x 906, 914-15 (11th
> Cir. 2015)].  . . .  Therefore, Robbins cannot obtain a
> dismissal of Rhodes' entire malicious prosecution claim
> against him on the basis of qualified immunity.  [Rhodes'
> Complaint] sufficiently alleges a claim of malicious
> prosecution against Robbins, to the extent Robbins
> included falsities in the Affidavit for Arrest Warrant.

Id. at 33-34 (emphasis added).  In so ruling, the Court noted that its decision
did not "preclude Robbins from reasserting his qualified immunity defense

later in this action as the facts of the case become more developed." Id. at 34 n.11 (citation omitted).  The instant Motion followed on October 29, 2019.

## II.    Summary Judgment Standard

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).   The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."   Rule 56(c)(1)(A).   "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."   Rule 56(c)(4).  Significantly, "[u]nsworn statements 'do[ ] not meet the requirements of [Rule 56(c)]' and cannot be considered by a district court in ruling on a summary judgment motion." Carr v. Tatangelo, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 n. 17 (1970)).

An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  Mize v. Jefferson City Bd.

of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."  Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim,' Celotex Corp. v. Catrett, 477 U.S. 317, 323, in order to discharge this initial responsibility."  Gonzalez v. Lee Cty. Hous. Auth., 161 F.3d 1290, 1294 (11th Cir. 1998).  Instead, the moving party simply may demonstrate "that there is an absence of evidence to support the nonmoving party's case."  Id.

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Jeffery v.

Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.   Qualified Immunity

The doctrine of "[q]ualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  As a result, this defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'"[3] Carr v. Tatangelo, 338 F.3d 1259, 1266 (11th Cir. 2003) (quoting Malley v. Briggs, 475 U.S. 335, 341

---

[3] In determining whether a defendant is entitled to qualified immunity, courts view the facts and all reasonable inferences in the light most favorable to the plaintiff to the extent supported by the record, and then considers "the legal issue of whether the plaintiff's 'facts,' if proven, show that the defendant violated clearly established law." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000); Scott v. Harris, 550 U.S. 372, 381 n.8 (2007).

(1986)).  Indeed, as "'government officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting Marsh v. Butler Cnty., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

To be entitled to qualified immunity, the defendant bears the initial burden to establish that his conduct was within the scope of his discretionary authority.  See Webster v. Beary, 228 F. App'x 844, 848 (11th Cir. 2007); Lee, 284 F.3d at 1194.  Here, neither party contends that Robbins was acting outside the scope of his discretionary authority when he obtained the arrest warrant and subsequently arrested Rhodes.  Therefore, the burden shifts to Rhodes "to show that qualified immunity is not appropriate." Lee, 284 F.3d at 1194.  To do so, Rhodes must establish two elements: (a) that Robbins violated a constitutional right, and (b) the right violated was clearly established. Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  The Court may consider these elements in whichever order it chooses, and qualified immunity will protect the defendant if the plaintiff fails to establish either element.  Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009).

Rhodes asserts that Robbins violated his clearly established right under the Fourth Amendment to be free from an unreasonable seizure because of a

malicious prosecution.  See generally Complaint.  To prevail on this claim, Rhodes must prove "a violation of his Fourth Amendment right to be free from unreasonable seizures, as well as the elements of the common law tort of malicious prosecution." Zargari v. United States, 658 F. App'x 501, 506 (11th Cir. 2016).  "[T]he constituent elements of the common law tort of malicious prosecution include[ ]: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused."  Paez v. Mulvey, 915 F.3d 1276, 1285 (11th Cir. 2019) (internal citation and quotation marks omitted)).

In considering whether an officer has probable cause to seek an arrest warrant, the Eleventh Circuit instructs that

> [f]or probable cause to exist, . . . an arrest must be objectively reasonable based on the totality of the circumstances.  This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.

Lee, 284 F.3d at 1195 (quotation and internal quotation marks and citation omitted).  However, "[t]o receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause."  Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010).  Accordingly, the dispositive

question for qualified immunity purposes "is not whether actual probable cause existed; rather, the question is whether the officer had 'arguable' probable cause." Carter v. Gore, 557 F. App'x 904, 908 (11th Cir. 2014). "Arguable probable cause exists 'where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[ ] could have believed that probable cause existed to arrest.'" Lee, 284 F.3d at 1195 (quotation omitted). "This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who unreasonably conclude that probable cause exists." Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137 (11th Cir. 2007).

As relevant here, the Eleventh Circuit has recognized that a law enforcement officer who makes an arrest pursuant to a warrant can be liable for malicious prosecution if the officer presented materially false statements in an affidavit in support of the arrest warrant. See Kelly v. Curtis, 21 F.3d 1544, 1554 (11th Cir. 1994); Carter, 557 F. App'x at 907-08. In this context, the Supreme Court has instructed that

> [t]he requirement that a warrant not issue but upon probable cause, supported by Oath or affirmation, would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile.

Franks v. Delaware, 438 U.S. 154, 168 (1978).  Accordingly, "[u]nder Franks, a police officer violates the Constitution if, in order to obtain a warrant, [he] perjures [himself] or testifies in reckless disregard of the truth."  Kelly, 21 F.3d at 1554.  In such settings, the officer would not be protected by qualified immunity.  Id. at 1555.

## IV.   Discussion

Rhodes argues that summary judgment is inappropriate because there are genuine disputes of material fact as to whether Robbins had probable cause to arrest Rhodes.  See Response at 8.  In support of this argument, Rhodes contends that "as it relates to the allegations on the claims of the specific patients remaining before the Court, these patients directly contradict what Defendant asserted in his arrest Affidavit for Arrest Warrant and demonstrate Defendant included falsehoods and fabrications in his affidavit."  Id.  More specifically, Rhodes asserts that

> [a]s to patients M.S./H.S., the allegation is that Dr.
> Rhodes was in essence double billing for manual therapy
> sessions which only lasted 15 minutes.  However, M.S.
> has provided a notarized statement asserting that she
> "also received 30 minute massages."  See Exhibit B.
> There is a similar allegation as it relates to patient H.C.,
> where Defendant alleged Rhodes billed for two units of
> manual therapy instead of one.  Yet, patient H.C.
> provides an affidavit directly to the contrary. . . .  In sum,
> these patients directly dispute what is alleged in
> Defendant's arrest affidavit and undercut the probable
> cause asserted therein as to Dr. Rhodes committing
> insurance fraud relating to these patients.  Without

such falsities, there is no probable cause or arguable
probable cause Dr. Rhodes committed insurance fraud
relating to these patients.

<u>Id.</u> at 8-9.   In addition, Rhodes contends that Robbins "knowingly made
material omissions" and "operated under objectively unreasonable mistakes to
both law and fact as it relates to the particular crimes he alleged that Dr.
Rhodes is to have committed." <u>Id.</u> at 14.

At the outset, the Court finds that it need not consider Rhodes'
arguments regarding alleged omissions or mistakes of law and fact in the
Affidavit for Arrest Warrant, because the Court considered and rejected these
arguments in ruling on the Motion to Dismiss.  In his Response, Rhodes argues
that contrary to the statements in the Affidavit for Arrest Warrant, Florida
law permits a chiropractor to bill for manual therapy performed by unlicensed
medical assistants and that the CMS Medicare Manual permits providers to
bill for two units of manual therapy if the session lasts 23 minutes.  <u>See</u>
Response at 9-14.  In the Order denying the Motion to Dismiss, the Court
considered these same arguments in the context of the schemes to defraud
charge against Rhodes and determined that Rhodes had "not sufficiently
alleged that Robbins' mistake of law was unreasonable . . . ." Order at 21.  In
doing so, the Court explicitly rejected the arguments now raised in the
Response:

18

Rhodes has not sufficiently alleged that Robbins'
mistake of law was unreasonable . . . . First, the Florida
case cited by Rhodes, State Farm Mut. Auto. Ins. Co. v.
Universal Med. Ctr. of S. Fla., Inc., 881 So. 2d 557, 560-
61 (Fla. 3d DCA 2004) (Universal Med. Ctr. of S. Fla.,
Inc.), is a Florida state appellate decision addressing a
dispute between insurance carriers in which the court
answered a narrow certified question about medical
assistants. The decision sheds no light on whether
"manual therapy" performed by an unlicensed massage
therapist can be billed under billing code CPT 97140.
Indeed, at least one insurance provider believed, and
reported to Robbins, that Rhodes' practice of doing so
was unlawful. Affidavit for Arrest Warrant at 2. The
Universal Med. Ctr. of S. Fla., Inc. decision similarly
fails to establish whether the specific treatments
provided by the unlicensed individuals, and for which
Rhodes submitted insurance claims, were in fact of the
sort required to be provided by a licensed therapist or
registered chiropractic assistants. As such, it fails to
support a conclusion that Rhodes' assessment was
"plainly incompetent." Moreover, Rhodes has not
directed the Court to any other authority of which
Robbins should have been aware regarding whether
unlicensed therapists could perform the specific manual
therapies at issue, or whether such therapies performed
by unlicensed therapists could be billed under the CPT
code used by Rhodes, and the Court has been unable to
find any legal authority addressing the same.

Similarly, Rhodes has not directed the Court to any legal
precedent, nor was the Court able to find any
establishing that Rhodes' apparent double billing for
manual therapy was indeed lawful, and that Robbins'
conclusion otherwise represented an unreasonable
mistake of law. Regardless of whether Medicare or other
insurance regulations allow a provider to "bill for two
units" if the session lasts for at least twenty-three
minutes, Robbins' Affidavit for Arrest Warrant reflects
that a witness told him Rhodes was billing for more
units of manual therapy than he provided. Affidavit for

> Arrest Warrant at 2.   It further reflects that the employee witness told Robbins that Rhodes directed her "to show more units of manual therapy" than she actually provided.  <u>Id.</u> at 2. Perhaps, as Rhodes suggests, this witness was mistaken as to the required length of a treatment unit, but that does not undermine Robbins' reliance on her factual representations.
>
>  . . . Accordingly, the Court is not persuaded that Rhodes has sufficiently alleged that Robbins' mistake of law rises to the level of the "plainly incompetent." <u>Carr</u>, 338 F.3d at 1259.

<u>See</u> Order at 22-23.  Importantly, the Court further held that "as to Rhodes' allegations that Robbins omitted information from the Affidavit for Arrest Warrant, Rhodes has failed to sufficiently plead that Robbins lacked arguable probable cause to arrest Rhodes for false and fraudulent insurance claims." <u>Id.</u> at 24-25.  Thus, the Court foreclosed Rhodes' arguments regarding omissions and mistakes of law and fact.

Turning to Rhodes' argument that Robbins included false statements in the Affidavit for Arrest Warrant, the Court concludes that Rhodes has failed to submit sufficient evidence to create a genuine issue of fact for trial on the claim that Robbins violated his Fourth Amendment rights by including false statements in the Affidavit for Arrest Warrant.   Rhodes has submitted absolutely no evidence in support of his allegations that the Affidavit for Arrest Warrant contained false statements as to patients H.S. and A.N.  Moreover, assuming the statements submitted by Rhodes can be considered to be proper

summary judgment evidence,[4] the Court finds that they fail to raise any genuine issue of fact for trial. Rhodes maintains that the statements "directly contradict what Defendant asserted in his Affidavit for Arrest Warrant and demonstrate Defendant included falsehoods and fabrications in his affidavit." Response at 8. Upon review, however, the Court finds this argument to be unavailing. Indeed, although the declarants deny the veracity of certain statements they made to Robbins, they do not deny having said what Robbins recorded in his Affidavit for Arrest Warrant when they spoke to him.

---

[4] The R.G., M.S., and Mosely Statements do not meet the evidentiary requirements of Rule 56. These signed, notarized statements are not affidavits because they are unsworn. See Carr, 338 F.3d at 1273 n.26 ("Because the preliminary report was submitted without attestation, it had no probative value and properly was not considered by the district judge in ruling on the officers' summary judgment motions."). Nor can the statements be considered declarations under 28 U.S.C. § 1746, as the authors did not declare that their statements are true and correct under penalty of perjury. See West v. Higgins, 346 F. App'x 423, 425-26 (11th Cir. 2009) ("Unsworn statements . . . should not be 'consider[ed] in determining the propriety of summary judgment.' Federal law does provide an alternative to making a sworn statement, but requires that the statement include a handwritten averment, signed and dated, that the statement is true under the penalties of perjury." (quoting Gordon v. Watson, 622 F.2d 120, 123 (5th Cir. 1980); 28 U.S.C. § 1746)). In addition, although the H.C. Statement purports to be an affidavit, it does not indicate whether the notary placed H.C. under oath or merely confirmed H.C.'s identity. See Fla. Stat. § 117.05(4)(b) (requiring a notary public to indicate on a jurat "[t]he type of notarial act performed, on oath or an acknowledgment, evidenced by the words 'sworn' or 'acknowledged'"); Fla. Stat. § 117.05(13)(a) (the form jurat in the Florida Statutes for an oath or affirmation instructing notaries to write that the affiant was "[s]worn to (or affirmed) and subscribed before [the notary] by means of . . . physical presence or . . . online notarization"); Shaw v. United States, Case No. 8:09-cr-251-T-30MAP, 2016 WL 1047382, at *7 (M.D. Fla. Mar. 10, 2016) ("[W]hile the affidavit was notarized by . . . an apparent relative of Petitioner . . . the notary jurat does not comply with Fla. Stat. §§ 117.05(4)(f) and (5). Specifically, the jurat does not include the type of identification, either based on personal knowledge or the specific type of identification the notary is relying upon in identifying the signer of the affidavit. . . . This alone makes the affidavit invalid."); Wood v. Sec'y, Dep't of Corr., 793 F. App'x 813, 819 (11th Cir. 2019) (noting that "a letter with a purported notary stamp, which does not comply with the requirements of Florida law," does not constitute an affidavit).

The R.G. Statement (Doc. 43-1) provides in relevant part:

> I R.G. do assert that I did receive two units of massage/manual therapy most of the visits at Dr. Rhodes office.
>
> . . .
>
> I also confirm that I did receive traction/roller many times prior to February 2014 during my visits at Dr. Rhodes office.

Rhodes argues that this statement contradicts the allegation in the Affidavit for Arrest Warrant that Rhodes made false insurance claims because R.G. did not receive traction therapy until February 2014. However, in her statement, R.G. does not affirmatively represent that <u>she never told Robbins</u> that she did not receive traction therapy before February 2014. Nor does R.G. describe the length of her sessions or deny having told Robbins during the investigation that her therapy sessions were less than 30 minutes.

The M.S. Statement (Doc. 43-2) provides in relevant part:

> As to the statements made in case #14-216
> I told detectives I didn't like the Rollertable and stopped use.
> I did recieve [sic] ultrasound.
> I also received 30 min. massage's [sic].

Rhodes also contends that M.S.'s statement that she "received 30 min. massage's [sic]," refutes the allegation in the Affidavit for Arrest Warrant "that Dr. Rhodes was in essence double billing for manual therapy sessions which only lasted 15 minutes," <u>see</u> Response at 8. Like R.G., M.S. does not deny

having told Robbins during the investigation that she received massages that lasted only fifteen minutes.

The H.C. Statement (Doc. 43-4) provides in relevant part:

> 1.   I was a voluntary 2nd time patient of [Rhodes].
> . . .
>
> . . .
>
> 3.   I was interviewed by Detectives from the Florida Department of Insurance Fraud.  Those Detectives did not explain to me that 2 units of service were actually 23 minutes of services provided even though they had to have known it.  Once that was explained to me, I can state clearly that I always received 2 units of Manual Therapy while attending Ocean View.  I have also been made aware that Missy Ross testified under oath that she always performed 2 units of Manual Therapy on me, so any billing issues by anyone about that evaporated.
>
> 4.   I was not told by those Detectives that manual therapy was what I was billed for, not Massage, nor that this Manual Therapy could be performed by anyone in the office when under the supervision of Dr. Rhodes, who had all the proper licenses to allow this.
>
> 5.   The Detectives wrote in their notes that Missy Ross performed only 1 unit of manual therapy during each visit.  That is untrue and not what I said to them. They did not show me that on many occasions I had received 2 units of Manual therapy but only been billed for 1 unit.  Since I assume that they had the billing records from the insurance company, they had to have known that my account had actually been under-billed not over-billed.  I don't believe they were honest in how they dealt with me.
>
> 6.    . . . I see from the records that Dr. Rhodes actually placed me on the roller bed/traction table

> several times himself as well as others in the office. So,
> my statements to the Detectives that I hadn't received
> that treatment but once or twice was incorrect.

Rhodes contends that this statement directly contradicts the allegation in the

Affidavit for Arrest Warrant that "Rhodes billed for two units of manual

therapy instead of one." Id. at 9. However, H.C. does not deny telling Robbins

his manual therapy sessions lasted approximately 15 minutes. Indeed, H.C.'s

statement reads more like an after-the-fact assertion that he received two

units of therapy, which is not the same as denying ever having told Robbins

that he was treated for only 15 minutes at a time.

Finally, the Moseley Statement (Doc. 43-6) provides in relevant part:

> After reading the statements by detectives relating what
> I said, I want to convey there are are [sic] many, actually
> most all of the statements, were falsely written by them.
> I loved working for Dr. Rhodes, and never observed him
> overbilling, or billing for a patient not treated, etc. And
> to clarify, the patients that made allegations while I
> worked there, such as H.C. received multiple therapies
> [such] as traction, even neck harness traction, U.S., each
> visit, and was always in the manual therapy room with
> Missy Ross for at least 30 min. . . . I regret that my
> statements were misrepresented, and that any question
> of Dr. Rhodes [sic] integrity and honest billing practices
> were ever questioned. I enjoyed working there . . . .

Rhodes argues that Moseley's statement "directly contradict[s] what the

Defendant represented she said to him during his interview of her." See

Response at 6. However, the Summary Report indicates that Moseley told

Robbins that "there may have been billing for massages that H.C. did not

receive." <u>See</u> Summary Report at 35 (emphasis added).  The M.S. Statement simply does not raise a disputed issue of material fact as to whether Robbins' allegations in the Affidavit for Arrest Warrant relating to H.C. (i.e., that State Farm was billed for manual and massage therapy that H.C. never received) were knowingly false.

In short, even considering the statements submitted by Rhodes, the Court concludes that he has failed to raise a genuine dispute of fact as to whether the Affidavit for Arrest Warrant included false statements.  Although Rhodes' allegations of false statements were sufficient to survive a motion to dismiss, at the summary judgment stage Rhodes was required to do more than rely on allegations.  He must point to "evidence beyond the pleadings" that shows a genuine dispute of material fact as to his § 1983 malicious prosecution claim, which he has failed to do.  <u>Celotex</u>, 477 U.S. at 324.  Because the statements in the Affidavit for Arrest Warrant establish at least arguable probable cause that Rhodes was committing insurance fraud, and because Rhodes has failed to point to evidence creating an issue for trial on his claim that Robbins knowingly included false information in the Affidavit for Arrest Warrant, Robbins is entitled to the protection of qualified immunity.  As such, summary judgement is due to be entered in favor of Robbins.

Accordingly, it is **ORDERED:**

1.      Defendant's Motion for Summary Judgment (Doc. 33) is **GRANTED**.

2.      The **Clerk of Court** shall enter judgment in favor of Defendant Paul Robbins and close the file.

**DONE AND ORDERED** in Jacksonville, Florida on March 30, 2021.

**MARCIA MORALES HOWARD**
United States District Judge

lc23
Copies to:
Counsel of Record